**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 24-CR-77-CRC** |
| **JOHN ANTHONY SCHUBERT,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence John Anthony Schubert to 27 months of imprisonment (the midpoint of the advisory Guidelines range), three years of supervised release, $2,000 in restitution, and a mandatory assessment of $100.

## I.       INTRODUCTION

The defendant, John Anthony Schubert, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

Schubert, a 48-year-old former plumber from Bradenton, Florida, was part of the initial breach of the restricted perimeter around the Capitol, which took place at the Peace Circle. Schubert continued to the West Front where he took advantage of the chaos to assault a Capitol Police Officer who was part of a defensive line.  Following that assault, Schubert entered the Capitol by climbing through a smashed window next to the Senate Wing Door, and, ignoring the persistent, audible, blaring, alarm, turned and helped his parents climb through that same broken window.  Schubert remained in the building for over 30 minutes.

The government recommends that the Court sentence Schubert to 27 months of incarceration for violation of 18 U.S.C. §111(a)(1).  A 27-month sentence reflects the gravity of Schubert's conduct, but also acknowledges his early admission of guilt.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 23, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.      Schubert's Role in the January 6, 2021 Attack on the Capitol

Schubert traveled from Florida to Washington, D.C. with a friend, where Schubert met up

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

with his father, John Schubert, and stepmother, Amy Schubert.[2]  On January 6, 2021, Schubert, his friend, and his parents, began their day at the rally for the former president.  Schubert left the rally before then-president Trump finished his speech.  From there, he made his way towards the Capitol building, arriving at Peace Circle, a traffic circle at the end of Pennsylvania Avenue on the northwest side of the Capitol grounds, sometime before 1:00 p.m.

On January 6, 2021, the Capitol building and its surrounding grounds were closed to visitors, and a restricted perimeter had been established around its grounds in anticipation of the Vice President's visit and the certification of the 2020 election.  The restricted perimeter was made clear to the public through linked, metal bike-rack barriers and snow fencing, many of which bore signs that read "Area Closed By Order of the United States Capitol Police Board" ("Area Closed signs").  Bike-rack barriers had been placed on the sidewalk across from the Peace Circle to mark the western boundary of the restricted area.

Additional barriers were established within the outer perimeter to further restrict access to the building.  One such barrier was a barricade of bike racks, reinforced with snow fencing and zip ties, with several Area Closed signs attached, that barred the way up the Pennsylvania Walkway towards the Capitol building.  The Pennsylvania Walkway is a footpath that runs from the West Plaza of the Capitol building to the sidewalk across the street from the Peace Circle statue.

Schubert arrived at Peace Circle sometime before 12:50 p.m., as five USCP officers were

---

[2] John and Amy Schubert each pleaded guilty to one count of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), and were each sentenced to 18 months of probation. *See*, *United States v. Amy Schubert*, 21-cr-00588-ABJ; *United States v. John Schubert*, 21-cr-00587-ABJ.

positioned were positioned at the top of a staircase and behind the second barricade on the Pennsylvania Walkway.



Image 1: Screenshot from Exhibit 1 at 1:46,
showing Peace Circle after Schubert arrived in the area

At approximately 12:53 p.m., a rioter opened a section of the first metal bike-rack barricade at the sidewalk across from the Peace Circle statue and walked onto the Capitol grounds, marking the first breach of the restricted perimeter in what became the riot that interrupted the certification proceedings. The officers descended the stairs to man the barricade on the Pennsylvania Walkway and another officer moved from the West lawn to join them.

The crowd began to forcibly push the barricades into the line of officers. Schubert joined and began pushing and pulling on a barricade, ultimately driving the barricade a few feet towards the stairs, creating a gap between the barricades on the north side of the walkway.



Image 2: Photograph showing Schubert (circled in red) pushing and pulling on a barricade at Peace Circle.

Schubert ran around the remnants of the barricades and climbed to the top of the stairs, out-flanking officers below.  At the top of the stairs, Schubert turned around, raised a hand in triumph, and screamed and cheered as other rioters continued to engage with officers below.



Image 3: Screenshot from Exhibit 2 at 00:31 showing
Schubert (circled in red) after breaching the restricted perimeter at Peace Circle

From his vantage point at the top of the stairs, he could see officers trying to maintain control of

the perimeter and the crowd overrunning the barricades.

6



Image 4: Screenshot of exhibit 3 at 00:53,
showing Schubert (circled in red) watching as rioters continued to overrun barricades at Peace Circle

By this point, the barricades were down, and the officers outmanned.  The rest of the rioters quickly overwhelmed the police line, and the USCP officers, some of whom were seriously injured during the fighting, retreated towards the Capitol building.

USCP officers, who were eventually reinforced by Metropolitan Police Department ("MPD") officers, were able to establish a new defensive line at the West Front. Rioters fought against the police line in this area to attempt to gain access to the Capitol building.   At approximately 1:11 p.m., only 18 minutes after opening the floodgates for other rioters at Peace Circle, Schubert was on the south end of the Lower West Terrace near the front of a large crowd on the West Plaza and near a line of police officers who had formed another defensive line. Officers attempted to disperse and defend against the crowd with non-lethal force, and one rioter

was struck in the cheek with a less-than-lethal munition.  Rioters in the area became enraged and a melee ensued.  Schubert joined the melee, throwing his left shoulder and body into USCP Officer G.T.  While Schubert continued to drive his left shoulder and body weight into Officer G.T., he also hurled his right fist at the officer, though it is unclear whether his fist connected.



Image 5: Screenshot from Exhibit 4 at 00:39 showing Schubert (circled in red)
attempting to punch United States Capitol Police Officer G.T.

Schubert disengaged after approximately 8 seconds as another officer deployed a chemical irritant at the crowd.  Schubert retreated to the West lawn, where he removed the blue long-sleeve shirt that he was wearing when he was hit with the chemical irritant.

Approximately an hour later, Schubert and his parents arrived on the Upper West Terrace. Schubert walked directly towards the Senate Wing Door and entered the building at the first opportunity—by climbing through a broken window.



Images 6 (left) and 7 (right): Screenshots from Exhibit 5 at 6:36 (Image 3) and 06:41 (image 4) showing Schubert (circled in red) entering the Capitol by climbing through a broken window



Images 8 (left) and 9 (right): Screenshots from Exhibit 6 at 00:37 (Image 3) and 00:42 (image 6) showing Schubert (circled in red) entering the Capitol by climbing through a broken window before turning to help his parents (circled in green)

When Schubert climbed through that window at approximately 2:22 p.m., broken glass was littered on the floor and a loud alarm was blaring.  Schubert then turned around and helped his parents climb through the broken window.  From there, Schubert turned South and walked towards the Crypt and ascended a set of stairs before reaching the Crypt.  He entered the Rotunda at approximately 2:26 p.m., walked south through the Rotunda and Statuary Hall to the Statuary Hall Connector.  As one of the first rioters to enter the Statuary Hall Connector, he saw an officer holding his arm up, indicating that Schubert, and the rest of the crowd, should not advance further.

10



Image 10: Screenshot from Exhibit 7 at 1:08 showing Schubert (circled in red), an officer (circled in yellow), and Schubert's father (circled in green)

Officers formed a defensive line and Schubert remained in the area for over ten minutes until rioters overran the line of officers. From there, Schubert neared the East Front House Door at approximately 2:43 p.m. According to a text sent on January 6, 2021, by Schubert's stepmother, a "woman in the capital building was shot 20 feet in front of us." To be that close to the location where Ashli Babitt was shot, Schubert would have walked past the East Front House Door to the Speaker's Lobby. By 2:46 p.m., Schubert again neared the East Front House Door but, approximately one minute later, again turned towards the Speaker's Lobby. Schubert approached the East Front House Door for a third time at approximately 2:54 p.m., where he watched as law

enforcement tried to clear the area.  He eventually exited the Capitol at approximately 2:56 p.m.,

announcing to an officer, "I've got my parents."



Image 11: Screenshot from Exhibit 8 at 14:31 showing Schubert (circled in red), his father (circled in green), and his stepmother (circled in purple) near the East Front House Door



Image 12: Screenshot from Exhibit 8 at 15:29 showing Schubert (circled in red)
and his father (circled in green) near the East Front House Door

In total, Schubert spent approximately 34 minutes inside the Capitol on January 6, 2021.

## III.    THE CHARGES AND PLEA AGREEMENT

On April 11, 2024, Schubert was charged by information and convicted of assaulting, resisting, or impeding certain officers based on a guilty plea pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Schubert now faces sentencing on one count of assaulting, resisting, or impeding certain officers in violation of 18 U.S.C. § 111(a).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office ("PSR"), the defendant faces up to eight years of imprisonment, a term of supervised release

13

of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The PSR correctly calculates the Guidelines as follows:

Count One: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[3] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **17** |

*See* Initial PSR, ECF No. 26, ¶¶ 33-43.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 46. Accordingly, based on the total adjusted offense level, after acceptance of responsibility, at 17, Schubert's Guidelines imprisonment range is 24 to 30 months of imprisonment. Schubert's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained in the PSR.

---

[3] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).  As described below, on balance, the Section 3553(a) factors weigh in favor of the government's recommended sentence.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Schubert's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.  As Schubert approached Peace Circle, the scene made plain that entry on Capitol Grounds was not allowed.  Despite this, he was part of the first breach of the restricted perimeter and participated in a melee and attacked an officer trying to defend the Capitol. And, he remained inside the Capitol despite knowing that another rioter had been shot by law enforcement.  Ultimately, Schubert's conduct helped pave the way for other rioters to breach the restricted perimeter and storm the Capitol.  The nature and circumstances of Schubert's offense were of the utmost seriousness, and fully support the government's recommended sentence of 27 months of imprisonment.

### B.  The History and Characteristics of the Defendant

On January 6, Schubert was a 45-year-old man capable of knowing right from wrong.  The fact that Schubert does not have any criminal history category points and has been compliant while on pretrial release is adequately reflected in his advisory guideline range and does not warrant a downward variance.  Serving as a caretaker for his friend's father, which he does in exchange for housing and financial support, is also not a mitigating factor here.  Schubert has not been formally

employed since 2018 and his role as a caretaker is, essentially, his employment.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Schubert's criminal conduct on January 6—breaching a police line and assaulting a law enforcement officer—was the epitome of disrespect for the law. When Schubert entered the Capitol grounds, it was abundantly clear to him that police officers were overwhelmed, outnumbered, and in serious danger. Schubert directly contributed to this danger by assaulting an officer protecting the Capitol. A 27-month sentence is necessary to reflect the seriousness of Schubert's conduct and to promote respect for the law.

### D. The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

Since January 6, Schubert has not taken any steps to denounce his actions that day. Indeed, while Schubert has accepted responsibility, he has never shown true remorse. As such, a period of

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

incarceration is needed for specific deterrence.

### E. The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F. Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

17

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).  After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."  *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."  *Id.* at 1095.  "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances."  *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[6]

_____

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Creek*, 21-cr-645-DLF, the defendant pushed through barriers, grabbed an officer, drove him back forcefully several feet, and hit him in the face shield of his helmet. Creek then shoved another officer in the shoulders and kicked him, causing that officer to fall. Next, Creek threw a ratchet in the direction of officers. After committing this assaultive conduct on the West Plaza, Creek tried, but failed, to enter the Capitol. Creek was convicted of 18 U.S.C. § 111(a) and faced the same Guidelines range. The court imposed a sentence of 27 months of incarceration. Like Creek, Schubert engaged with officers multiple times. Schubert pushed and pulled on the barricades at Peace Circle when officers were directly behind those officers. Schubert then reengaged with officers on the Lower West Terrace. Unlike Creek, who did not make it inside the Capitol, Schubert climbed through a broken window to enter the Capitol, assisted other people in climbing through that broken window, and stayed inside the Capitol for over 30 minutes. Schubert's conduct is at least as serious as Creek's and warrants a similar sentence.

In *United States v. Mackrell*, 21-cr-276 (CKK), the defendant pushed on metal barricades on the West Front of the Capitol, and pushed, grabbed, tackled, and threw objects at USCP Officers. Mackrell was convicted of 18 U.S.C. § 111(a) and faced the same Guidelines range. The court imposed a sentence of 27 months of incarceration. Though Schubert committed only one

To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

assault, his conduct involves different aggravating factors not present in the *Mackrell* case. Schubert, for example, forcefully moved a barricade at Peace Circle, then out-flanked officers trying to hold rioters back. Moments after moving the barricade, rioters surged past officers and up towards the Capitol and eventually pouring into the Capitol building. While Mackrell remained outside of the Capitol, Schubert entered the Capitol and remained in the Capitol after confronting a police line and being present while another rioter was shot.

In *United States v. Eckerman*, 21-cr-623, when Eckerman arrived at the Capitol, rioters were already fighting with officers on the West Plaza. Though the defendant witnessed the violence, he continued to the Upper West Terrace and into the Capitol. While inside the Capitol, the defendant was part of a mob that surged past three separate police lines and, during one of those breaches, pushed a Capitol Police officer, causing that officer to fall. The defendant pled guilty to a violation of 18 U.S.C. § 111(a) and the Court sentenced the defendant to 20 months of imprisonment. Like Eckerman, Schubert encountered, and surged past, multiple police lines on January 6, 2021. But Eckerman arrived at the Capitol over an hour after Schubert did. Schubert saw the initial barriers at Peace Circle and saw the Area Closed signs and engaged in the early onslaught of violence against USCP Officers. Schubert, moreover, led his parents through the Capitol. These are aggravating factors that were not present in the *Eckerman* case.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639

F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7]  Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).  At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3).  *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.  The government has not been able to identify the victim in this case.  The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Schubert must pay $2,000 in restitution, which reflects in part the role Schubert played in the riot on January 6.[8]  Plea Agreement at ¶ 12.  As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.*  Schubert's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 115.

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   FINE

Schubert's convictions for violations of 18 U.S.C. §111(a)(1) subject him to a statutory maximum fine of $250,000.  *See* 18 U.S.C. § 3571(b).  In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources.  *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).  The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine.  U.S.S.G. § 5E1.2(a) (2023).  Here, Schubert's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine.

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 27 months of imprisonment (the midpoint of the advisory Guidelines range), three years of supervised release, $2,000 in restitution, and a mandatory assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:   /s/ Anna Z. Krasinski
ANNA Z. KRASINSKI
Assistant United States Attorney
New Hampshire Bar No. 276778
United States Attorney's Office
Detailed from the District of New
Hampshire
(603) 451-7851
anna.krasinski@usdoj.gov